IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JOSEPH P MAST,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>　　　　　Defendant. | CASE NO. 1:21–cv–2370<br><br>DISTRICT JUDGE<br>JOHN R. ADAMS<br><br>MAGISTRATE JUDGE<br>JAMES E. GRIMES JR.<br><br>**REPORT &<br>RECOMMENDATION** |

Plaintiff Joseph P. Mast filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Disability Insurance Benefits and Supplemental Security Income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In July 2019, Mast filed applications for Disability Insurance Benefits and Supplemental Security Income alleging a disability onset date of June 29,

2018, claiming he was disabled due to paranoid schizophrenia.[1] Tr. 75, 77. The Social Security Administration (SSA) denied Mast's application and his motion for reconsideration. Tr. 94–95, 99–100, 106–107, 111–112. Mast requested a hearing before an Administrative Law Judge (ALJ). Tr. 113–114.

The ALJ held an administrative hearing in November 2020. Tr. 28–60. Mast and vocational expert Dr. Marne[2] South testified. *Id*. In December 2020, the ALJ issued a written decision finding that Mast was not disabled. Tr. 15–23. The ALJ's decision became final on October 18, 2021, when the Social Security Administration's Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

Mast filed this action on April 1, 2022. Doc. 9. He asserts the following assignments of error:

1. The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers. As such, the decision in this case by an ALJ who derived her authority from Andrew Saul was constitutionally defective.

2. The ALJ erred when she failed to find that the waxing and waning of Mast's psychological symptoms combined with the side effects of his medication would preclude him from engaging in substantial gainful activity on a full–time and sustained basis.

Doc. 9 at p. 1.

---

[1]    "Once a finding of disability is made, the ALJ must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.,* 193 F.App'x 422, 425 (6th Cir. 2006).

[2]    Dr. South's given name is "Marne" on his curriculum vitae, Tr. 240–241, and "Marney" throughout the record. *E.g.* Tr. 51, Doc. 9, at p. 4. The Court will spell Dr. South's name as provided by Dr. South.

**Evidence**

>    *1.    Personal and vocational evidence*

Mast was born in 1972 and was 48 years old on the alleged onset date. Tr. 77. He earned his college degree from the University of Akron and previously worked as an auditor of worker's compensation and general liability insurance policies. Tr. 37–38. Mast has worked as a self-employed insurance auditor as well as a company employee. Tr. 37–38.

>    *2.    Medical evidence[3]*

Mast's first schizophrenic episode occurred in April 2013; he reports experiencing audio and visual hallucinations at that time. Tr. 44, 63. These symptoms stopped when he began consistently taking prescribed psychiatric medication. Tr. 44–45. His last schizophrenic incident was in December 2014, a time period during which Mast was prescribed his medication in pill form and, on occasion, forgot to take his pills. Tr. 44–45, 54. Since switching to injections as his medication delivery method, Mast has not had a schizophrenic incident. *Id*.

During the relevant time period, Alternative Paths in Medina, Ohio provided Mast's pertinent medical treatment. Tr. 243–351. Roger Sparhawk, M.D., was Mast's initial primary treating physician at Alternative Paths. Tr. 308. Dr. Sparhawk initially prescribed injections of Abilify which improved

---

[3]    The recitation of medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs.

Mast's mental health but caused unhealthy weight gain. Tr. 308. So, in January 2016, Dr. Sparhawk transitioned Mast to a monthly injection of haloperidol decanoate, or Haldol, instead.[4]

In June 2016, Dr. Sparhawk observed that Mast had psychomotor activity, or "some leg bouncing," and "seem[ed] to have a bit of a stare." *Id*. Mast reported that he felt Haldol worked equally as well as Abilify and his clinicians agreed; Mast remained on Haldol throughout the time period at issue. Tr. 305, 243–355.

In September 2016, Mast reported experiencing the following side effects from his medication: sedation, drowsiness, and the inability to stop fidgeting. Tr. 303.

The following year, in September 2017, Robert Alcorn, M.D., replaced Dr. Sparhawk as Mast's primary treating clinician at Alternative Paths. Tr. 292. Dr. Alcorn described Mast as a "patient… with paranoid psychosis," and noted his "staring gaze." *Id*. Mast admitted to Dr. Alcorn that he thought "the cops [were] out to get [him]" but also indicated that his medications kept those "bad thoughts" away. *Id*.

A year after that, in November 2018, Dr. Alcorn's again observed Mast's "staring gaze" which "eased up a bit as [they] talked." Tr. 269.

---

[4] According to the Mayo Clinic's Drugs and Supplements online database, the brand name for haloperidol is Haldol or Haldol decanoate. *See* https://www. mayoclinic.org/drugs–supplements/haloperidol–intramuscular– route/description/drg–20072783 (last accessed Oct. 7, 2022).

Several months later, in May 2019, Ryan Bednar, PMHNP–BC (Nurse Bednar), replaced Dr. Alcorn as Mast's primary treating clinician. Tr. 258. Mast admitted to Nurse Bednar that he had been experiencing paranoia that the police were looking into his life and following him, thoughts he hadn't experienced in years. *Id*. Mast denied being tired all day but noted a lack of energy. *Id*. He indicated that restless leg syndrome, for which he was prescribed ropinirole, "[ran] in his family." *Id*.  Nurse Bednar adjusted Mast's prescriptions for Benadryl and Gabapentin. Tr. 261.

In July 2019, Mast reported feeling tired when he woke up in the morning but indicated he was no longer tired during the day. Tr. 253. Mast also stated that he no longer thought the police were after him or looking into his life. Tr. 258. Nurse Bednar observed a muscle twitch in Mast's shoulder and legs which Mast indicated he'd had for a decade or longer; it predated his taking any psychiatric medication. Tr. 254. Nurse Bednar noted Mast's difficulty concentrating. Tr. 253.

In October 2019, Mast told Nurse Bednar he felt tired and was taking Benedryl to help him sleep, although he was "still tired throughout the day." Tr. 345 Nurse Bednar indicated this symptom might have been a side effect of the Haldol. *Id*. Mast noted his preference to be on "less and less medication," not more. Tr. 345.

In January 2020, Mast reported that his mood had been "good" the last couple of months. Tr. 243.

5

In April 2020, Mast reported that he had been "status quo," without depression or anxiety. Tr. 314. He was working from home and able to get out and play disc golf. *Id*. Mast admitted that it was sometimes hard for him to fall asleep but stated that this was not a problem and was not distressing to him, and that he still slept eight to nine hours each night. *Id*.

In July 2020, Mast indicated everything had been "good and status quo." Tr. 239. He denied problems with his medications, denied health problems or issues in the preceding three months, and indicated he was feeling good during the day. *Id*.

Throughout the relevant time period, Mast's clinicians found Mast well-groomed, his behavior polite and cooperative, his mood euthymic, his affect appropriate, his thought processes logical, coherent, and linear, his memory intact, and his attention, concentration, insight, and judgment appropriate. Tr. 284, 244–45, 249–50, 254–55, 259–60, 265–66, 270–71, 275–76, 280–81, 292, 316, 330–31. Mast was notably pleasant and happy, and regularly mentioned his disc golf hobby and ongoing work as an auditor. Tr. 243, 248, 253, 258, 264, 269, 274, 305, 314, 329, 334, 340, 345.

6

3.      *State agency opinions*[5]

In February 2020, state agency psychologist Sandy Banks, Ph.D., found no limitation in Mast's ability to understand, remember, or apply information; no limitation in his ability to interact with others; moderate limitation in his ability to concentrate, persist, or maintain pace; and no limitation in his ability to adapt or manage himself. Tr. 65. Dr. Banks reviewed the record and opined that Mast retained the concentration, persistence, and pace to carry out simple and complex tasks. Tr. 66–67. Dr. Banks noted the normal findings Mast's physicians observed, including his coherent speech, euthymic mood, appropriate affect, logical thought processes, normal cognition, intact memory, intact insight and judgment, and age-appropriate concentration and attention span. Tr. 66. Dr. Banks opined that Mast did not satisfy the criteria for Listing 12.03, Schizophrenia Spectrum and Other Psychotic Disorders.

In July 2020, state agency psychologist Paul Tangeman, Ph.D., affirmed Dr. Banks' findings. Tr. 78–82.

---

[5]      When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

4.    *Hearing testimony*

In November 2020, the ALJ held a hearing at which Mast, who was represented by counsel, and a vocational expert testified. Mast stated that he lives in a house with his eighty-nine-year-old father. Tr. 35. Mast's father pays Mast's bills in exchange for assistance with household needs such as grocery shopping and meal preparation. Tr. 35. Mast accompanies his father when his father needs to go anywhere. Tr. 35. Mast used to do his grocery shopping in-person and needed to bring a list so that he would not forget things. Tr. 45. During the global pandemic, carrying a list became unnecessary because he began ordering groceries online. Tr. 36, 45. Now he only needs to drive to the store and wait in the parking lot until his order is ready for pick-up. Tr. 36. Socially, he plays disc golf with friends about once a week during the summer and, infrequently goes out to eat. *Id.*

Mast previously worked as a worker's compensation and general liability insurance policy auditor. Tr. 38. On behalf of insurance companies, Mast was hired to impartially audit commercial policyholders at the end of each policy period and determine the premium amount owed to the company or due to the policyholder. Tr. 38. When conducting an audit, Mast was responsible for classifying a policyholder's employees by job description and payroll, writing descriptions of the policyholder's operations, and reviewing its subcontractors to confirm independent insurance coverage. Tr. 38. Mast

8

performed this job primarily seated at a laptop in an office, working from home one day each week and on-site when necessary. Tr. 40.

By February 2020, Mast was no longer able to work because he was tired all the time and could not keep up with the production demands. Tr. 41, 46–47. He used to have energy all the time but since he started taking medication, his mind wanders and he is not able to focus. Tr. 46–47. Mast is tired and unable to concentrate on his spreadsheets. *Id.* He believes the medication caused this change in him, not his sleep-wake schedule. Tr. 42. He believes his lack of energy causes him to be unable to do any type of work and will not allow him to stand on his feet for eight hours. Tr. 50.

Vocational expert Marne South, M.D., also testified at the hearing.[6] Tr. 51–60. Having reading Mast's file and listened to Mast's testimony, Dr. South discussed Mast's past work history. Tr. 52. For a series of hypothetical inquiries, Dr. South characterized Mast's past work as "benefits clerk II," which Dr. South indicated is sedentary and semi-skilled work. Tr. 53. The ALJ asked whether a hypothetical individual Mast's same age and with the same education level and work history as Mast could perform work at all exertional

---

[6]  A vocational expert's testimony "is directed solely to whether, given a claimant's age, experience, and education, along with the ALJ's assessment of what the claimant 'can and cannot do," there exist a significant number of employment opportunities for the claimant in the regional and national economies." *Webb*, 368 F.3d at 633. The vocational expert considers the claimant's residual functional capacity, "'age, education, and work experience' and assess whether the claimant 'can make an adjustment to other work.'" *Id.* (quoting 20 C.F.R. § 416.920(a)(4)(v)).

levels, limited to simple routine tasks in a work environment without tasks involving high production closes or fast-paced demands, and in which there are only occasional changes in workplace tasks or duties. Tr. 53–54. Dr. South responded that such a person could not perform Mast's past work but could perform jobs with a medium level of exertion such as marker, press tender, or day worker. Tr. 55. The ALJ asked how many jobs would be available for such an individual if that individual was off-task greater than 10% of the time, to which Dr. South responded there would be no jobs available. Tr. 55. The ALJ asked whether jobs would be available for such an individual if, on a regular and on-going basis, the individual was absent, late, left early, or any combination thereof more frequently than once a month. Tr. 55-56. Dr. South responded that there would be no jobs available. Dr. South also indicated there would be no jobs available for such an individual if that individual required two additional breaks per day unless those breaks were limited to a very short time frame such as five minutes or less. Tr. 57.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through March 31, 2022

2.  The claimant has not engaged in substantial gainful activity since June 29, 2018, the alleged onset date (20 C.F.R 404.1571 *et seq*., and 416.971 *et seq*.).

3.  The claimant has the following severe impairments: Schizophrenia (20 C.F.R. 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is able to perform simple, routine tasks in a work environment where there are no tasks that involve high production quotas or fast-paced production demands, and where there are only occasional changes in workplace tasks or duties.

6.   The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).

7.   The claimant was born on June 3, 1972, and was 46 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 C.F.R. 404.1563 and 416.963).

8.   The claimant has at least a high school education (20 C.F.R. 404.1564 and 416.964).

9.   Transferabilty of job skills is not material to the determination of disability because using the Medical–Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*see* SSR 82–41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569, 404.1569a, 416.969, and 416.969a).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from June 29, 2018 through [October 18, 2021] (20 C.F.R. 404.1520(g) and 416.920(g)).

Tr. 15–23.

**Standard for Disability**

Eligibility for benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* § 1382c(a)(3)(A).

An ALJ is required to follow a five–step sequential analysis to make a disability determination:

> 1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.
>
> 2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.
>
> 3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.
>
> 4. What is the claimant's residual functional capacity, and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.
>
> 5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner

at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)).

A court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469,

477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th C *Standard of review*

The Court's review of an SSA ALJ's decision is limited to the question of "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Hargett v. Comm'r of Soc. Sec.*, 964 F.3d 546, 551 (6th Cir. 2020); *see* 42 U.S.C. § 405(g). "Substantial evidence … is 'such relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). The SSA's findings of fact are "conclusive" "if supported by substantial evidence." 42 U.S.C. § 405(g). The Court must nonetheless reverse if the ALJ fails to follow agency rules or regulations. *Hargett*, 964 F.3d at 551.

**Discussion**

1. *Mast is not entitled to relief based on his separation of powers argument.*

Mast first argues that because the Social Security Administration's former commissioner's tenure protection was unconstitutional, he is entitled to a new administrative hearing.[7] Doc. 9, at 6–10. Defendant concedes that

----

7    Defendant does not challenge Mast's standing to bring this claim. Given *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2195–96 (2020), Mast has standing to raise this issue. *See Collins v. Yellen*, 141 S. Ct. 1761, 1780 (2021) ("As we have explained on many prior occasions, the separation of

Commissioner Saul's tenure protection, *see* 42 U.S.C. § 902(a)(3), "violate[d] the Constitution's separation of powers," but denies that the violation warrants a new hearing. Doc. 10 at p. 5-6. I agree with Defendant.

The SSA is headed by a single commissioner who, by statute, may only be removed from office on a presidential "finding … of neglect of duty or malfeasance in office." 42 U.S.C. § 902(a)(3). In *Seila Law*, the Supreme Court held that the Constitution's separation of powers prohibits Congress from fashioning a single-member, independent agency whose head is removable only for "inefficiency, neglect of duty, or malfeasance in office." 140 S. Ct. at 2197-2207. When confronted with a similarly structured agency, headed by a single director who could only be removed for cause, the Court in *Collins v. Yellen*, found itself bound by *Seila Law* and held that the director's for cause removal protection violated the Constitution. 121 S. Ct. 1761, 1784 (2021).

The Court in *Collins* then considered whether the respondents were entitled to any relief. The Court stressed that while the director's removal protection was unconstitutional, there was no question that his appointment was valid. *Id*. at 1787–88. As the Court put it, while the director's removal protection "unconstitutionally limited the President's authority …, there was no constitutional defect in the statutorily prescribed method of appointment to

---

powers is designed to preserve the liberty of all the people. So whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge.") (citations omitted). I reject, however, Mast's assertion that he has standing *because* Defendant hasn't challenged his standing. Doc. 11, at 2.

that office." *Id.* at 1787. Because this was the case, "there is no reason to regard any of the actions taken by the" agency "as void." *Id.* And these facts served to distinguish previous cases involving unconstitutional appointments as opposed to unconstitutional removal protections. *Id.* at 1788. The Court then expressed doubt that the Respondents could show that the director's unconstitutional removal protection caused them harm but granted the possibility that "an unconstitutional provision [could] inflict compensable harm." *Id.* at 1788–89. So the Court remanded. *Id.* at 1789.

Since the Court decided *Seila Law*, a host of social security claimants have relied on it to argue that they are entitled to new hearings. But after *Collins*, courts have repeatedly rejected these arguments, principally because the claimants have been unable to show that "the unconstitutional removal provision actually harmed" them. *Kaufmann v. Kijakazi*, 32 F.4th 843, 849 (9th Cir. 2022); *see* Defendant's Br. at 8–9 n.4. As the Sixth Circuit has recognized, "*Collins* … provides a clear instruction: To invalidate an agency action due to a removal violation, that constitutional infirmity must 'cause harm' to the challenging party." *Calcutt v. Fed. Deposit Ins. Corp.*, 37 F.4th 293, 316 (6th Cir. 2022), *mandate recalled by* 2022 WL 4546340 (U.S. Sept. 29, 2022) (No. 22A255).

Mast, however, never leaves the starting gate on this issue; he doesn't attempt to show harm. Instead, he argues that the Commissioner's removal protections render void his actions and those of his delegates. Doc. 9, at 7–8;

16

*see* Doc. 11, at 3–6. So he misreads *Seila Law* and ignores *Collins*'s emphasis on the fact that an unconstitutional removal provision has no bearing on the validity of an appointment or actions taken under that appointment. 141 S. Ct. at 1787–88; *see* Doc. 11, at 6 (relying on *Lucia v. SEC*, 138 S. Ct. 2044 (2018), an Appointments Clause decision). Also, because he hasn't tried to show actual harm, Mast has necessarily failed to carry his burden to show harm. *See Calcutt*, 37 F.4th at 316. And his vague claims of harm in his reply fare no better. *See* Doc. 11, at 4; *Calcutt*, 37 F.4th at 317 ("vague, generalized allegations" are not enough to satisfy *Collins*).

In his reply, Mast attempts to distinguish the SSA commissioner's tenure protection from the tenure protections at issue in *Collins* and *Seila*. Doc. 11 at 2–3. According to Mast, the protections in these latter cases "were not as limiting as" the commissioner's for-cause protection. Doc. 11, at 2–3. This is a red herring. The strength of the tenure protection at issue is irrelevant because the SSA concedes that the commissioner's for-cause protection was unconstitutional.[8] Mast doesn't get bonus points for showing that the commissioner's tenure protection was even more unconstitutional. Moreover, Mast is mistaken. The tenure protection at issue here, "neglect of duty or malfeasance in office," 42 U.S.C. § 902(a)(3), is nearly the same as in *Seila*, *see*

---

[8]     Mast cites nothing to support his argument, perhaps because Congress has never explained what "inefficiency, neglect of duty, or malfeasance in office" means. *See PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 130–37 (D.C. Cir. 2018) (Griffith, J., concurring), *abrogated by Seila L. LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020).

12 U.S.C. § 5491(c)(3) (2012), and stronger than the *for cause* protection at issue in *Collins, see* 12 U.S.C. § 4512(b)(2); *Collins*, 141 S. Ct. at 1786 ("the Recovery Act's 'for cause" restriction appears to give the President more removal authority than other removal provisions reviewed by this Court"").

     2. *The ALJ did not commit reversible error at step three.*

     At step three of the disability evaluation process, a claimant will be found disabled if his impairments meet or equal one of the entries in the Social Security Administration's listing of impairments. 20 C.F.R. § 404.1520(a)(4)(iii). "[A] claimant is also disabled if her impairment is the *medical equivalent* of a listing[.]" *Id.* (emphasis in original).

     Mast argues that the ALJ committed errors that entitle him to relief. At the outset, however, Mast's brief does him no favors. Although represented by counsel, he employs a stream-of-consciousness presentation that turns determining what's at issue into a challenge.

     For starters, the caption to Mast's second argument suggests that his second argument will feature a discussion of how the ALJ erred in finding that Mast couldn't "engag[e] in substantial gainful activity." Doc. 9, at 10. But Mast barely mentions this issue in his argument and instead meanders around issues without fully developing any. So Mast has waived his arguments

     But even putting waiver aside, trying to decipher what Mast presented doesn't help him. Review of Mast's second argument suggests the possibility that he is challenging the ALJ's step-three analysis, *see* Doc. 9, at 12–13, and

the ALJ's step-four residual functional capacity analysis, *id.* at 13–15. As to the former possibility, Mast appears to begin with a criticism of the ALJ's step-three analysis of whether Mast met Listing 12.03. Unfortunately, he merely asserts that "[t]he actual evidence," apparently "documented above," supports his argument. Doc. 9, at 12–13. But this leads to the question of where "above" he documented this evidence. For instance, Mast says "As set forth above, he had extreme difficulty maintaining his ability to concentrate, persist, and maintain pace." *Id.* at 12. But the facts he recites at the beginning of his argument merely reflect that he once reported "difficulty concentrating," *id.* at 11 (citing Tr. 258), and that he testified that he couldn't work due to tiredness and inability to concentrate, *id.* (citing Tr. 45).[9] The recited facts don't touch on Mast's ability to persist or maintain pace and he doesn't explain how those fact show that his difficulty concentrating was "extreme."

Moreover, in the part of his second argument that may be his challenge to the ALJ's listing analysis, Mast only cites the evidentiary portion of the record once. Doc. 9 at 13 (citing Tr. 284). Otherwise, he doesn't cite the record to support his assertions and doesn't engage with the standard of review and explain why substantial evidence does not support the ALJ's determination

---

[9]     Mast also asserted "it is clear, as set forth above, that Mast had delusions along with problems thinking and concentrating." Doc. No. 9, at 11. But since he doesn't explain where this was allegedly made clear, it doesn't affect the analysis.

that Mast failed to meet the paragraph B criteria of listing 12.03. So, if Mast is challenging the ALJ's listing analysis, his challenge fails.

Moving to what appears to be Mast's step-four challenge, Mast cites the decision in *Keyse v. Saul*, No. 1:19cv2495, 2021 WL 1214691, *20 (N.D. Ohio Mar. 31, 2021) and argues that the ALJ erred by failing to "consider the entire record regarding the waxing and waning of symptoms." Doc. 9, at 13–14. The portion of *Keyse* that Mast cites lies amid an ALJ's residual functional capacity (RFC) [10] analysis. *See Keyse*, 2021 WL 1214691, at *15–21. Mast seems to challenge this aspect of the ALJ's analysis, saying that the ALJ failed to account for Mast's paranoia about police. Doc. 9 at 13–14. The flaw in this argument is that the ALJ accounted for Mast's paranoia about police *during* her residual functional capacity analysis. Tr. 20.

Mast also says that he "is alleging disability due to the fact that his functional limitations were sufficient to establish disability." Doc. 9 at 15. He notes that SSR 96-8p requires that a residual functional assessment "must include a narrative discussion describing how the evidence supports each conclusion." SSR 96-8p; Doc. 9 at 15. But Mast doesn't say how the ALJ failed to follow this command. Instead, he baldly says that "the ALJ discounted

---

[10]     An RFC is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard c. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it is the Social Security Agency's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

Mast's sleepiness and lack of ability to concentrate." Doc. 9, at 16. He provides nothing, however, to support this assertion. *Id*. Indeed, giving the ALJ's lengthy step-four discussion, nothing could support it. *See* Doc. 5, at 19–22.

Mast adds that through this alleged discounting, "the ALJ erroneously failed to consider the totality of Mast's impairments and limitations and whether he could engage in substantial gainful activity on a sustained and full-time basis requiring," thus requiring a remand. Doc. 9, at 16. But "saying it does not make it so." *GTE Serv. Corp. v. FCC*, 205 F.3d 416, 426 (D.C. Cir. 2000). And failing to support an assertion waives it. So Mast's step-four challenge fails, as well.

Finally, Mast says that he is entitled to relief because the ALJ failed to "build an accurate and logical bridge between the evidence documenting Mast's disabling problems and the ALJ's decision to deny benefits." Doc. 9, at 16. Again, however, Mast provides no support or explanation for this assertion. The assertion is thus waived.

**Conclusion**

For the reasons explained above, I recommend that the Commissioner's decision be affirmed.

Dated: October 12, 2022

　　　　　　　　　　　　　　 */s/ James E. Grimes Jr.*
　　　　　　　　　　　　　　 James E. Grimes Jr.
　　　　　　　　　　　　　　 U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019).